THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MICHAEL A. ROMERO, Defendant-Appellant.
Second District   No. 2—88—0798

Opinion filed October 2, 1989.—Modified on denial of rehearing October 7, 1989.

Frederick F. Cohn, of Chicago, for appellant.

Thomas F. Baker, State's Attorney, of Woodstock, and Immel, Zelle, Ogren, McClain, Germeraad & Costello, of Springfield (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, and Kevin T. McClain, of counsel), for the People.

JUSTICE McLAREN delivered the opinion of the court:

Michael A. Romero was convicted of unlawful possession of a controlled substance with intent to deliver (Ill. Rev. Stat. 1987, ch. 56½, par. 1401(a)(2)), and was sentenced to the Illinois Department of Corrections for a period of 15 years. We reverse, and remand the cause.

On May 20, 1987, police entered the home of Michael A. Romero (defendant) pursuant to a search warrant. Defendant did not possess any contraband on his person. However, a search of the upstairs loft bathroom produced a toiletry bag containing a bottle of perfume, a toothbrush, an emery board, a sewing kit, a comb, and four plastic bags containing a total of 36.9 grams of white powder, subsequently identified as cocaine. The toiletry bag also contained part of a Deering-type grinder, a glass vial containing cocaine residue, and a "snow blower." The only things protruding from the toiletry bag were the tops of the plastic bags. The white powder was not visible from outside the toiletry bag. Police also found in the bathroom medicine cabinet a small scale covered with white residue.

A search of the room connected with the bathroom revealed an envelope containing $2,400 in cash. Also found on top of a chest of drawers in the room was another part of a Deering grinder and $520 in cash. Police discovered a bottle of Inositol, used to cut or adulterate cocaine, buried under assorted men's and women's clothing in a hamper. Police also seized a handgun and some marijuana.

After the search, defendant was arrested.

At the time of the arrest, Quinn Molenda was living at the Romero home. Molenda's brother, Ralph, was also visiting at the time. On May 19, the day before defendant's arrest, Quinn Molenda was arrested, along with his friends, Bill Balacek and Phillip Corea, for delivery of a controlled substance containing cocaine. Quinn Molenda

and Balacek may have been present at the Romero home on the afternoon of May 19, 1987. Also present at the Romero home at various times on May 19 were social friends of the Romeros, Amy Eisenhart and Bob Mears. Mears, who was also doing construction work for the Romeros, possessed a key to the house.

On the day of the trial, a story about the case appeared on pages 1 and 2 of a local newspaper. This story contained information on defendant's two previous arrests for possession of cocaine and marijuana. It also reported that a handgun and marijuana were found in defendant's house. The trial court had previously suppressed all these facts via an order *in limine*. Reports on the case had also been broadcast on the radio. Defense counsel moved to have the jury questioned to determine if any of the jurors had read the story. The court denied the motion.

During the trial, the court heard contradictory testimony as to the living arrangements in the Romero house. Prosecution witnesses testified that there was no evidence that the Romeros slept on the first floor of the house. Police officers testified that they only saw a crib in the first-floor bedroom. They did find men's and women's clothing in the loft room, as well as a dresser containing socks, a watch, a wallet, and a wedding picture of the Romeros. Defense witnesses testified that the first-floor bedroom contained a bed. A closet containing men's suits was also located on the first floor. There was no dispute regarding the fact that Quinn and Ralph Molenda slept in the basement of the house.

One of the prosecution witnesses was Bill Balacek. Balacek testified that, while riding to the police station and again in a jail cell, defendant told him that either Balacek or Molenda would "have to take the fall *** [and] say that we had access to the bathroom." However, an affidavit prepared by Balacek's lawyer before trial contained no mention of the incident in the jail cell. Balacek also testified that defendant promised to obtain a lawyer for Balacek, and that attorney Timothy McNamee did visit him in jail. However, jail records did not show any visit by McNamee.

At the time of his testimony, Balacek was out of jail on bond, facing four indictments for delivery of controlled substance, including one Class X felony. He testified that he had not discussed the topic of obtaining leniency in exchange for his testimony and had no expectation of receiving it.

On cross-examination, Balacek admitted that his affidavit attached to his motion to reduce bond contained a false statement. He swore falsely that his driver's license had never been suspended or revoked.

He testified that the affidavit had been prepared by his attorney and that he signed it without reading it first.

Defendant did not testify at trial. Prosecution, in its closing argument, asserted that the alleged conversations between defendant and Balacek were uncontradicted and unrebutted. Defendant objected, but the court overruled the objection, stating that the jury had heard the evidence of the conversations.

Defendant was convicted and sentenced to the Illinois Department of Corrections for 15 years. It is from this conviction that defendant appeals.

Defendant's first contention is that the evidence is insufficient to sustain his conviction. We disagree.

■■ To prove one guilty of possession of controlled substances (drugs), the State must establish knowledge on the part of the defendant of the presence of the drugs and that the drugs were in defendant's immediate and exclusive control. (*People v. Embry* (1960), 20 Ill. 2d 331, 334; *People v. Birge* (1985), 137 Ill. App. 3d 781, 790.) Since possession may be constructive, actual physical possession by the defendant is not required. (*People v. Galloway* (1963), 28 Ill. 2d 355, 358; *Birge*, 137 Ill. App. 3d at 790.) As it is difficult to prove directly that defendant had knowledge of the presence of drugs, this element may be proved by "evidence of acts, declarations or conduct of the accused from which the inference may be fairly drawn that he knew of the existence of the narcotics at the place where they were found." (*Embry*, 20 Ill. 2d at 334.) If it is shown that defendant controls the premises, an inference of both knowledge and possession by defendant arises which may be sufficient to sustain a guilty verdict, absent other facts and circumstances which might raise a reasonable doubt as to guilt. (*People v. Nettles* (1961), 23 Ill. 2d 306, 308-09; *People v. Luetkemeyer* (1979), 74 Ill. App. 3d 708, 713.) Mere access by other persons is no defense, as defendant's possession may be joint with another. (*Birge*, 137 Ill. App. 3d at 790.) Finally, whether or not defendant had knowledge and possession is a question of fact, and the findings of the trier of fact will not be reversed unless the evidence is so palpably contrary to the verdict, or so improbable as to create a reasonable doubt of guilt. *Galloway*, 28 Ill. 2d at 358; *Birge*, 137 Ill. App. 3d at 791.

■ Our review of the evidence fails to reveal such contrary or improbable evidence. Defendant was co-owner of the house in which the cocaine was found and was living in the house at the time of the search. Evidence that the drugs were found at the same address as that at which defendant lives supports the conviction for constructive

possession. (*Galloway*, 28 Ill. 2d at 359-60; *Birge*, 137 Ill. App. 3d at 791.) Also supporting the conviction was the testimony, though contradicted, of the living arrangements at the Romero home. Ralph Molenda, who was living at the Romero home at the time of the search, testified that defendant and his wife slept in the upstairs loft bedroom, which was next to the bathroom in which the cocaine was found. That bedroom was also the room in which the two piles of cash, part of a grinder, and the bottle of Inositol were found. Molenda also testified that he was instructed by the Romeros to use the downstairs bathroom instead of the upstairs bathroom. This testimony is further corroborated by the fact that men's and women's clothing, both clean and dirty, were found in the upstairs bedroom.

It is true that others may have had access to the loft rooms. We infer that defendant's wife had the run of the house. The Molendas, although allegedly directed not to use the loft, lived in the basement. There was disputed testimony as to whether or not Bill Balacek was seen in the loft. Bob Mears, who testified to Balacek's presence, himself had a key to the Romero house and had access while the Romeros were not at home. However, access by others does not preclude a finding of possession. (*Nettles*, 23 Ill. 2d at 308.) Defendants have even been found in possession of drugs discovered in abodes in which they lived only part time. (See *Galloway*, 28 Ill. 2d 355; *Birge*, 137 Ill. App. 3d 781; *Luetkemeyer*, 74 Ill. App. 3d 708.) We do not find a lack of evidence, merely a conflict of evidence, as to defendant's constructive possession. The conclusions to be drawn from this evidence rests upon which witnesses the jury chose to believe.

■ Defendant attacks the credibility of only one witness, Bill Balacek. Balacek's testimony is admittedly fraught with inconsistent statements and possible perjury regarding his expectation of leniency in his own drug trials. However, this is only one witness of many, and the jury had ample opportunity to observe his demeanor as he gave testimony. The jury may or may not have given Balacek's testimony any credence. In either event, the other evidence presented was sufficient to support a guilty verdict.

■ Defendant also argues that the supreme court in *People v. Housby* (1981), 84 Ill. 2d 415, overruled any cases that permitted an inference of constructive possession from defendant's mere tenancy in the abode in which drugs were found. Assuming, *arguendo*, that defendant's interpretation of *Housby* is correct, we find his conclusion to be inapplicable here. In the case before us, there exists evidence beyond mere tenancy from which the jury could infer possession. The living arrangements in the home, the location of the cocaine and other

paraphernalia, and the testimony of Balacek, disputed though it be, provided the jury with ample opportunity to infer defendant's possession. Defendant's argument is therefore inapplicable.

Defendant further argues that the evidence was insufficient to sustain his conviction of possession with intent to deliver. We disagree.

■■ In Illinois, a reasonable inference of intent to deliver arises from the possession of a quantity of drugs in excess of an amount that could be viewed as designed for personal use. (*People v. Schaefer* (1985), 133 Ill. App. 3d 697, 702.) Other factors which may enhance this inference include the manner in which the drugs are kept, and the existence of other paraphernalia. (*Schaefer*, 133 Ill. App. 3d at 703.) Large amounts of cash and the presence of material suitable for cutting the cocaine may also be considered. *People v. Trask* (1988), 167 Ill. App. 3d 694, 708.

■■ Defendant possessed 36.9 grams of cocaine, which had a street value, according to Lieutenant Schinkel, a State witness, of at least $3,700 to $4,000. Sergeant Mason, another witness for the State, testified as to the amount of cocaine ingested at one time by an average user. According to Mason, one gram of cocaine would be divided into 10 "lines," with an average user ingesting two lines per dose. Thus, with five doses per gram, and 36.9 grams, the seized cocaine amounted to 184.5 doses. The jury could easily find that 184 doses was an amount in excess of that usually retained for personal use. The value of the cocaine also may be seen to exceed the amount of money spent on personal consumption. In addition, the police seized over $2,900 in cash, a grinder and a scale, both of which are properly viewed as drug paraphernalia, and the bottle of Inositol, used to "cut" cocaine. The cocaine itself was in four separate plastic bags. All these factors considered together could allow the jury to infer intent to deliver.

The evidence presented was not improbable or palpably contrary to the verdict reached. Therefore, we will not disturb the findings of the jury. The verdict is affirmed.

Defendant next contends that his constitutional right not to testify was violated by the prosecutor's closing argument. According to defendant, the prosecutor argued in a manner designed to call attention to defendant's failure to testify.

The complained-of argument occurred in the State's rebuttal argument. Regarding the testimony as to the alleged conversation between defendant and Balacek in the squad car, the prosecutor argued:

"[MR. PACK]: Did you hear any contradiction? Was that con-

tradicted at all that it wasn't said to Balacek? Was it rebutted at all?

MR. DOHERTY: Excuse me. Objection.

MR. PACK: Why? Evidence. Unrebutted evidence.

THE COURT: It is in evidence. The jury has heard it. Proceed. Finish up.

MR. PACK: You heard that testimony. Unrebutted, uncontradicted. That was said that Mr. Romero said that to Bill Balacek."

Later in his argument, the prosecutor mentioned the "totally unrebutted and uncontradicted" testimony that men's and women's clothing was found in the loft bedroom. After objection by defense counsel, the court told the jury, "[T]he Defendant doesn't have to testify, contradict or prove anything."

■■ The prosecution cannot directly or indirectly comment on the defendant's failure to testify in his own defense. (*People v. Lyles* (1985), 106 Ill. 2d 373, 390.) However, the prosecution may refer to the uncontradicted nature of the evidence, even where the defendant is the only person who could have contradicted the evidence. (*Lyles*, 106 Ill. 2d at 390; *People v. Hopkins* (1972), 52 Ill. 2d 1, 6; *People v. White* (1977), 48 Ill. App. 3d 907, 914.) The test to determine whether or not a defendant's right not to testify has been violated by prosecutorial comments is whether the remarks were calculated to draw attention to defendant's failure to testify. *Lyles*, 106 Ill. 2d at 390; *White*, 48 Ill. App. 3d at 913.

■■ Nothing here indicates that there was a calculated effort by the prosecutor to highlight defendant's failure to testify. No direct reference was made to the fact that defendant did not testify. The remarks appear to be reasonable comments on the evidence. We conclude that the remarks were not improper direct or indirect comment on defendant's failure to testify.

Defendant next contends that he was denied due process when the prosecution elicited testimony allegedly in contravention of the court's prior order. We disagree.

The court granted defendant's motion *in limine* to exclude, among other things, evidence of the pistol found in the loft bathroom and all cannabis and cannabis pipes and holders seized. Sergeant Mason, a witness for the prosecution, testified that "he [Romero] reached into the bathroom and he handed me an object." Defendant's counsel objected, knowing that the object handed to Sergeant Mason was the handgun. After a conference, the court struck the question and answer from the record and instructed the jury to disregard

them. At no time did the jury hear testimony about what the object was. The court also sustained two objections to testimony of the presence of "roach clips" found in the search of the Romero house.

■■ The prosecution in no way exceeded the court's order when the police officer testified that defendant "reached into the bathroom and he handed me an object." The gun was never mentioned. The prosecution argued that the testimony was offered to show that defendant was in the bathroom containing the cocaine. The court determined that this relevant information was outweighed by the possible prejudice that could attach to defendant if the jurors were to speculate as to what the object was. The court, therefore, instructed the jury to disregard the question and answer. There was no error.

■■ It was error for the State's witnesses to testify as to the recovery of the roach clips. However, a conviction will not be reversed simply because the prosecution committed some error; the court must first determine that defendant has been denied justice and that the verdict was the result of the error. (*People v. Campbell* (1984), 126 Ill. App. 3d 1028, 1047.) In addition, an admonition to the jury to disregard the question will generally relieve substantial prejudice, preserve fairness, and cure any error. *Campbell*, 126 Ill. App. 3d at 1047.

We determine that any error resulting from the mention of roach clips was harmless. There was sufficient other evidence to allow the jury to reach the verdict it did. The testimony regarding the roach clips was not developed any further, and the jury was admonished to disregard the references. In light of the other evidence and the minimal impact of the roach clip testimony, we determine that reversal is not appropriate upon these grounds.

Defendant next contends that the verdicts returned were insufficient to justify a conviction of possession with intent to deliver 15 or more grams. The verdict form returned by the jury read, "We, the jury, find the defendant, MICHAEL ROMERO, Guilty of the offense of UNLAWFUL POSSESSION OF CONTROLLED SUBSTANCE WITH INTENT TO DELIVERY [*sic*]." Defendant contends that this form did not permit the jury to find that defendant possessed at least 15 grams of cocaine.

Defendant objected to the verdict forms submitted to the jury. However, the verdict form submitted by defendant, and refused by the court, suffered from the same defect alleged to be error. It read, "We, the jury, find the defendant Michael Romero Guilty of the offense of Delivery of a Controlled Substance."

■■ Defense counsel, after objecting to the prosecution's verdict form, did not submit a verdict form which cured the perceived defect.

A party may not raise on appeal the failure to give an instruction unless he tendered it at trial. (*People v. Tannenbaum* (1980), 82 Ill. 2d 177, 180.) We find the situation before us to be analogous. The jury verdict .tendered by defendant is substantially the same as the form now under attack by defendant. The amount of possession is absent from both. Defendant may not now complain about the form since he did not tender a different verdict form. We find this issue to be waived.

Defendant's final· contention is that he was denied due process when the trial court failed to *voir dire* the jury to determine if any jurors had read a newspaper article. On the morning of the first day of trial, the Northwest Herald, a regional newspaper, published a story that defendant's counsel thought prejudicial to defendant. The abstract shows the following conversation took place outside of the jury:

"MR. DOHERTY: On May 10, 1988 the Northwest Herald, the regional newspaper up here, Judge, there's an article on the front page, right-hand column: 'Romero drug trial begins.' Continued on page two. In the article it is reported by the reporter, Jodie DeJonge, that Mr. Romero was arrested for possession of marijuana in 1974 while in high school and that in 1975 while in college in Colorado he was arrested for possession of cocaine.

Additionally, the matter which your Honor excluded, the article reports that a gun was found and also that cannabis was found.

My motion is that your Honor question the jury as to whether or not anyone has read any publicity, newspaper articles, television or radio.

\* \* \*

THE COURT: Must we do it by law? What is the law? Isn't it discretionary? Does the Court consider it? I have read the article. It is the truth what the article says, what went on in my courtroom. I never lock my courtroom. Was a motion outside the presence of the jury and they are cautioned two, three times a day not to discuss this or talk with anybody about it.

\* \* \*

Denied."

The record does not contain the article. However, we will consider those facts which are contained in the record.

█ Not every newspaper article published requires the court to poll a jury. (*People v. Cox* (1966), 74 Ill. App. 2d 342, 347.) The nature, content and prejudicial effect of the article must first be ex-

plored by the trial court in an exercise of sound discretion. (*Cox,* 74 Ill. App. 2d at 347.) It is the improper exercise of that discretion that is error, not the refusal to interrogate the jury. *People v. Sundaresh* (1987), 153 Ill. App. 3d 930, 935-36; *People v. Weaver* (1980), 90 Ill. App. 3d 299, 307.

It is apparent from the record that the trial court failed to exercise its sound discretion in this case. The article contained references to defendant's prior arrests for drug offenses and his possession of the handgun and cannabis, evidence of which had been excluded by the trial court via an order *in limine.* The possible prejudicial effect of this information if seen by a juror is obvious. Yet the record does not show that the trial court truly reflected on this possible effect. The court did view the article, but seemed unsure of the applicable law when making its ruling. In such an atmosphere of uncertainty, we do not find an exercise of sound discretion.

We have considered but found distinguishable the case of *People v. Barrow* (1989), 133 Ill. 2d 226. The supreme court in *Barrow* ruled that a jury poll is required only if the court determines that the publicity if prejudicial. (*Barrow,* 133 Ill. 2d at 263-64.) The court there noted that defendant failed to present the allegedly prejudicial article to the trial court and thus precluded the trial court from even evaluating its possible prejudicial impact. The supreme court then examined the article in question, which read as follows:

" 'The expected lengthy trial of Ronald Barrow on murder charges could be a little longer as a result of a delay today—or it could be shorter.

\* \* \*

Instead of resuming testimony at 10:00 a.m. as scheduled, La Salle County First Assitant State's Atty. Gary Garretson asked O'Berto Family members to step outside the courtroom to go to another office.

This lead [*sic*] to speculation a plea bargain might be reached between the prosecution and defense, thus shortening the trial. Of [*sic*], if the agreement fails, the discussion might lengthen the trial.' "

The supreme court found that even if the jurors had read the article, the contents were not so prejudicial as to deny defendant a fair trial. *Barrow,* 133 Ill. 2d at 264.

The case before us is clearly distinguishable from *Barrow.* Here, the trial court read a copy of the article provided by defendant and thus had an opportunity to explore its prejudicial effect. Our examination of the record revealed the obvious prejudice to defendant con-

tained in the article. The finding of prejudice and the trial court's improper exercise of discretion clearly distinguish this case from *Barrow*.

■■ ■ While a jury poll is not required every time jurors are potentially exposed to prejudicial media, such a poll is a salutary and beneficial practice. (See *Sundaresh*, 153 Ill. App. 3d at 936.) In this case, where the prejudicial article was published just as the trial was to begin, a jury poll would have revealed any juror exposed to the publication before the trial even started. A poll would also have reinforced in the jurors' minds the court's admonishment, given the day before, not to read newspaper articles about the trial. Such benefits are lost, however, and the defendant is denied a fair trial, when the court fails to exercise its discretion. Therefore, a new trial must be ordered.

For these reasons, the judgment of the circuit court of McHenry County is reversed, and the cause is remanded.

Reversed and remanded.

LINDBERG and REINHARD, JJ., concur.