THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PETER LETSOS, Defendant-Appellant.

Second District   No. 2—89—0709

Opinion filed September 28, 1990.

444

Kenneth D. Hubbard, of Joseph M. Laraia & Associates, P.C., of Wheaton (Joseph M. Laraia, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and James E. Ryan, State's Attorney, of Wheaton (Robert J. Ruiz, Solicitor General, and Kathryn M. Frost and Terrence M. Madsen, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE GEIGER delivered the opinion of the court:

After a bench trial, the defendant Peter Letsos was convicted of violating subsection 44(j)(1)(A) of the Illinois Environmental Protection Act (the Act) (Ill. Rev. Stat. 1989, ch. 111½, par. 1044(j)(1)(A)), based on allegations that he discharged a contaminant into the waters of the State without a permit. He was sentenced to two years' probation, 200 hours of community service and a $7,500 fine. He appeals, arguing that subsection 44(j)(1)(A) is unconstitutional and that the State failed to prove him guilty beyond a reasonable doubt. We affirm.

The major events underlying the charges against the defendant occurred in Glen Ellyn (the village) on September 30, 1987, at or near a

former gas station (the property). The defendant had purchased the property for redevelopment. The evidence showed that midafternoon on that day, the defendant began pumping the contents of underground gas storage tanks located on the property into the village's storm sewers. He allegedly believed that the tanks contained only water. During the pumping it was determined that the tanks were being emptied of gasoline, and the pumping was stopped.

Based on those events, the defendant was cited with the above-stated offense, as well as calculated criminal disposal of hazardous waste, criminal disposal of hazardous waste, and reckless disposal of hazardous waste (Ill. Rev. Stat. 1989, ch. 111½, pars. 1044(b), (c), (f), respectively). After the close of the State's case the defendant moved for a directed verdict. The court granted the motion as to the latter three charges; those charges are not at issue in this appeal. The defendant brought this appeal from his conviction based on subsection 44(j)(1)(A).

The defendant's first argument on appeal is that subsection 44(j)(1)(A), together with the other sections upon which its definition depends, is unconstitutional because it is vague, ambiguous, and subject to arbitrary enforcement. The defendant's argument focuses upon the Act's broad definition of the pivotal term "contaminant" (Ill. Rev. Stat 1989, ch. 111½, par. 1003.06). The State and Federal Constitutions' due process provisions require that criminal statutes provide "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *People v. Jihan* (1989), 127 Ill. 2d 379, 385.

Under subsection 44(j)(1)(A), it is unlawful for a person knowingly to violate subsection 12(f) of the Act. (Ill. Rev. Stat. 1989, ch. 111½, pars. 1044(j)(1)(A), 1012(f).) Subsection 12(f) provides, in relevant part, that "No person shall" cause or allow the discharge of any "contaminant" into the waters of the State without compliance with a National Pollutant Discharge Elimination System (NPDES) permit. (Ill. Rev. Stat. 1989, ch. 111½, par. 1012(f); see ch. 111½, pars. 1011(a)(2), 1039(b); 33 U.S.C. §1342 (1986).) Subsection 12(f) further provides that no permit shall be required for discharges that do not require a permit under the Federal Water Pollution Control Act (the Pollution Control Act). (Ill. Rev. Stat. 1989, ch. 111½, par. 1012(f).) The Act defines "contaminant" as "any solid, liquid, or gaseous matter, any odor, or any form of energy, from whatever source." Ill. Rev. Stat. 1989, ch. 111½, par. 1003.06.

We agree with the defendant that the Act's definition of "contaminant" is so broad as to include most substances. However, as the State observes, the Act does not require a permit for discharge of any "con-

taminant," but only for discharges requiring a permit under the Pollution Control Act. Thus, we consider subsection 44(j)(1)(A)'s constitutionality in light of the relevant Federal provisions.

The Pollution Control Act does not rely upon the term "contaminant." Rather, under it a permit is required only for the discharge of a "pollutant." (33 U.S.C. §§1311(a), 1342(a) (1986); *EPA v. California ex rel. State Water Resources Control Board* (1976), 426 U.S. 200, 205, 48 L. Ed. 2d 578, 583, 96 S. Ct. 2022, 2025; compare Ill. Rev. Stat. 1989, ch. 111½, par. 1011(a)(2).) The Pollution Control Act defines "pollutant" as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water[, with some exceptions]." 33 U.S.C. §1362(6) (1988).

The State argues that subsection 44(j)(1)(A) is not unconstitutionally vague when it is read together with the appropriate sections of the Pollution Control Act. We agree.

■ The defendant argues generally that a State statute which requires review of an entire Federal statute to ascertain fully its meaning is not constitutionally acceptable. We are not persuaded by his unsupported argument. The Act relies upon the Pollution Control Act for complete definition of the offense. However, as the State argues, a State statute may adopt Federal statutory provisions by reference. See *Thorpe v. Mahin* (1969), 43 Ill. 2d 36, 49.

■ The defendant also argues that the Pollution Control Act cannot cure the Act's unconstitutional vagueness, because the Pollution Control Act refers to the term "pollutant" rather than the term "contaminant" used in the Act (compare Ill. Rev. Stat. 1989, ch. 111½, par. 1011(a)(2), with 33 U.S.C. §1342(a) (1986)). We find that the difference is of no consequence and reject the defendant's unsupported argument. Section 12(f) of the Act prohibits contaminant discharge without a permit only if a permit is required under the Pollution Control Act (Ill. Rev. Stat. 1989, ch. 111½, par. 1012(f)); analysis of the Pollution Control Act points clearly to the Federal definition for "pollutant" to determine whether the Pollution Control Act requires a permit. The definition of the subsection 44(j)(1)(A) offense is clear; it is immaterial that the Act and the Pollution Control Act use different operative terms.

■ The defendant additionally argues that even if the Federal definition for "pollutant" satisfies constitutional requirements by limiting the subsection 44(j)(1)(A) offense, the definition is not sufficient in this case. The defendant relies upon the fact that the Pollution Control Act definition for "pollutant" does not include gasoline, the substance at is-

sue here. Although the Pollution Control Act definition does not specifically name "gasoline" or "petroleum products," the United States Court of Appeals has stated that it is apparent that Congress intended to include discharged gasoline in the definition. (*United States v. Hamel* (6th Cir. 1977), 551 F.2d 107, 111.) In light of *Hamel*, and in the absence of counterauthority, we reject the defendant's argument.

▪▪ ▪ To prevail in a vagueness challenge to a statute which does not implicate first amendment concerns, a criminal defendant must demonstrate that the statute in question was vague as applied to the conduct for which he is being prosecuted. (*People v. Jihan* (1989), 127 Ill. 2d 379, 385.) In summary, we do not find that the defendant has demonstrated vagueness. Rather, we find that the relevant statutory provisions considered as a unit are sufficiently clear and precise. The defendant has presented no authority to persuade us otherwise.

Insofar as the defendant argues that the State has not shown that one could obtain a permit to discharge gasoline in compliance with the Act and/or the Pollution Control Act, we find that his unsupported presentation does not merit lengthy comment. Assuming for the sake of argument that no permit was available for the discharge of gasoline from the defendant's underground storage tanks, the plain language of the provisions before us does not establish that a permit must be available for a challenged discharge before subsection 44(j)(1)(A) can be invoked.

The defendant's second argument on appeal is that he was not proved guilty beyond a reasonable doubt. He argues that there existed insufficient proof that he knew either that he was discharging something other than water into the storm sewer or that the discharge required a permit. We assume for the sake of argument that the State had the burden to prove both of those elements. We review the evidence in that light.

The State's first witness was Glen Ellyn staff engineer Robert E. Kincaid. Mr. Kincaid testified that he drove past the property at 4:25 p.m. on September 30. He observed the defendant pumping liquid into the gutter and detected a strong odor of gasoline. He questioned the defendant, who told him he was pumping water. Thereafter he radioed for police, reporting that a person was pumping gasoline into the storm sewer. He did not get out of his car and did nothing to turn off the pump.

Glen Ellyn police lieutenant Howard Thiele testified that he was sent to the property at 4 p.m. Upon arriving, he noticed the defendant standing next to a pump; he also noticed a faint odor of gasoline. After questioning the defendant, who stated that he was pumping water, Offi-

cer Thiele approached the discharge hose and noticed a reddish-brown discharge fluid. According to Officer Thiele, Glen Ellyn volunteer fireman Robert Morton, who arrived at the same time as he, placed his hand in the fluid stream and both men determined from the hand's smell that the discharge fluid was gasoline. Captain Morton then turned off the pump.

Glen Ellyn architect Charles Norris testified that the defendant had hired him to design a commercial building for the property. According to Mr. Norris, the defendant and he had discussed the property's fuel tanks and their removal within EPA guidelines. Additionally, Norris' construction drawings included the statement that the tanks and their contents had to be removed in accordance with EPA guidelines. Norris testified that he had not discussed with the defendant the contents of the EPA regulations or any permit requirements; he also had not described for the defendant how to comply with the EPA. Norris did not know what was in the tanks.

Fire Captain Morton testified consistently with Lieutenant Thiele. According to Morton, when he arrived at the property he saw a pump pumping a dark red liquid appearing to be gasoline. At the discharge hose, the pump liquid had the pungent odor of gasoline. According to Captain Morton, when he confronted the defendant with the assertion that the pumped liquid was gasoline, the defendant, who had claimed to be pumping water, responded with a disbelieving stare. Later, Morton viewed Lake Ellyn, into which the storm sewer flowed, and observed an oily slick on its top.

Glen Ellyn police officer Romen testified that he arrived at the property at 4:40 p.m. He tested the storage tanks' contents, and the results suggested that the tank from which pumping had occurred had a bottom one inch of water and a total of 63 inches of liquid contents. The other three tanks tested contained, respectively, 92 inches of water, 97 inches of a liquid other than water, and 45 inches of water.

Construction manager Paul Nielsen testified that his company was bidding for work on the defendant's property. Mr. Nielsen stated that he had informed the defendant that he should have the property's storage tanks removed by a licensed EPA excavator. The men did not discuss the tanks' contents, and Nielsen did not inform the defendant on how to remove the contents.

Excavating contractor Les Phillips testified that he had submitted a bid to remove the property's storage tanks. He further testified that he had spoken by telephone with a person who had identified himself as owner of the property and informed him that the tanks must be pumped out by a licensed waste hauler and cleaned out for removal. Phillips did

not, however, recall any conversation about a permit.

The State's final witness was underground storage tank installer Steven Rozycki. Rozycki testified that in spring of 1987 the defendant contacted him to remove underground storage tanks on the property. In their initial conversation, Rozycki understood that the tanks were empty. He submitted a bid to remove empty tanks. Around September 27, the defendant told Rozycki in a telephone conversation that a representative of the Clark Oil company, which had previously operated a service station on the property, had stated that the tanks were filled with water. Rozycki had told the defendant that the tanks must be emptied for removal. Further, Rozycki had explained that the liquid in the tanks could be removed by collecting any hydrocarbons, separating out the water, and pumping the water into the sewer if the village agreed. Alternatively, he had explained, the defendant could call a special hauler. In their conversations, Rozycki had offered an estimate of the defendant's cost to filter the tanks' contents.

The defense first called Glen Ellyn building inspector Charles Olson. Olson testified that on September 30 he saw the defendant at the property and stopped for a social visit. He drove through the discharge liquid when he stopped. At that time, he noticed no gasoline odor. He also noticed no odor at his car, approximately 20 to 25 feet from the pump. During their conversation near the pump, at around 3:45 p.m., the defendant asked Olson if he smelled gasoline; according to Olson, when he stood near the defendant he smelled a faint gasoline odor. The liquid discharge appeared to Olson to be water. He made no attempt to stop the defendant's pumping.

Glen Ellyn police community service officer Richard Perez testified that he went to the property after a report that someone was pumping gasoline. When he passed within a few inches of the discharge hose, he did not smell anything. When he looked closely at the liquid, felt and smelled it, he noticed a reddish-orange color and a slight smell of gasoline. According to Perez, although it did not appear in his report, the defendant had claimed to him that Inspector Olson had given permission for the pumping.

Carl Beckmen, owner of the service station across the street from the property, testified that a representative of the Clark Oil Company had dismantled the property's pumps and taken three to four hours to fill the underground tanks with water from a fire hydrant. Also according to Beckmen, around September 23 he had informed the defendant that he had observed that process. Beckmen had believed that the tanks contained only water, as it was illogical that anyone would abandon expensive gasoline. The defendant had borrowed Beckmen's stick for mea-

suring the tanks' contents; he had not, however, taken "test paste" for testing the contents of the tanks. The defendant had expressed to Beckmen that he agreed that the tanks were full of water.

Mr. Beckmen's service station manager James Raine testified that while working at Beckmen's, he had observed the defendant pumping from the property's underground tanks for approximately 40 minutes. During that time, between 4 and 4:15 p.m., he had come within 30 feet of the discharge hose. He described the discharge substance as water and said that he smelled no odor of gasoline coming from its direction.

Another Beckmen worker, Brett Fisher, testified that he had helped the defendant open the property's tank intake lids, stick in a hose, and stretch the discharge hose toward the street. He did not smell gasoline. Also, he had observed a discharge of what appeared to be water. During the next 45 minutes he was working approximately 20 or 25 feet away from the discharge; he never detected gasoline odor. According to Fisher, the defendant stayed near the pump throughout the pumping.

The defendant testified on his own behalf that he had emigrated to the United States in 1956 when he was 17 years old. He had a grade school education and had worked primarily in restaurants. According to the defendant, although he had looked at Mr. Norris' plans, before September 30 he had no idea what "EPA" stood for. The defendant testified to talking with Beckmen and borrowing his tank measuring stick. According to the defendant, after measuring the tanks, "deep in my heart I believed it was water." The defendant remembered that Mr. Rozycki had said that water in the tanks could go into the sewer. According to the defendant, if Rozycki had said something else, he had not heard it, as he believed the tanks held only water.

The defendant lastly testified that on September 29, he had happened to notice a friend's pump; at approximately 3 p.m. on September 30, he had borrowed it. While he was pumping, he stayed by the pump and detected no gasoline odor from there. He did not go to the end of the discharge hose. Even after questioning by Officer Perez, the defendant had still believed that the discharge was water.

In arguing that the State did not prove him guilty beyond a reasonable doubt, the defendant first asserts that the evidence clearly shows that he was not aware that there was gasoline left in the underground storage tanks or that he was pumping anything but water. In his reasonable doubt argument, the defendant also asserts that the State failed to meet its burden to prove that he was required to obtain an EPA permit before disposing of the contaminant. He largely blends together his two focuses.

Particularly regarding his knowledge that there was gasoline in the

pumped discharge, the defendant acknowledges that some gasoline was pumped from the tanks. However, he challenges that there is no evidence regarding either the quantity of gasoline pumped or the length of time he was pumping at least a partial gasoline mixture. The defendant reasons that as gasoline floats on water, and as there was water left in the tank from which he had been pumping the bottom, the pump had apparently reached gasoline only moments before the arrival of Lieutenant Thiele and Captain Morton. According to the defendant, he made an honest mistake on the tanks' contents. Particularly regarding his knowledge of the need for a permit, the defendant notes that the State failed to prove even that he knew what the letters "EPA" represented.

More generally, the defendant notes his limited education and experience. He also notes that Mr. Beckmen had told him that there was only water in the tanks, that Mr. Rozycki had described pumping water from the tanks into the storm sewer, and that at least one of the tanks contained only water when it was tested by Officer Romen. Additionally, he notes that he repeatedly had stated that he believed that the tanks held only water and that he had registered surprise when he was confronted ultimately by Captain Morton. The defendant also notes that several witnesses other than himself noticed no gasoline odor at the pump. He emphasizes that village officials Olson and Perez failed to stop the pumping, confirming his understanding that he was engaged in innocent activity, according to the defendant.

The defendant's argument also notes that the cost to filter the tanks' contents, as estimated by Mr. Rozycki, was negligible compared to the defendant's total financial undertaking connected with the property. The defendant's suggestion therefrom is that he would not have knowingly undertaken prohibited conduct in order to avoid the negligible cost. That is particularly so, the suggestion continues, given the circumstances here. The defendant undertook pumping in the middle of the day and in the village's business district; the pumping took an extended time, and the defendant stayed on the site at all times. According to the defendant, the circumstances show that he believed he had nothing to hide.

■■ When faced with a question of the sufficiency of the evidence, a reviewing court must examine the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261.) Examining the evidence in the prosecution's best light, we do not find that the court's finding was so palpably contrary to the verdict or improbable that it created a reasonable doubt of the defendant's guilt. See *People v.*

*Romero* (1989), 189 Ill. App. 3d 749, 754.

■ As to the defendant's knowledge of permit requirements, we re-iterate the following. Architect Norris informed the defendant that the tanks were to be removed in accordance with EPA regulations. Also, his plan drawings included notations of the need for compliance; all of those notations were discussed with the defendant, according to Norris. While the preliminary drawing's notation referred to "EPA regulations," a later drawing noted "comply with regulations of the Environmental Protection Agency." Excavator Phillips testified that he told his caller, presumably the defendant, who acknowledged speaking with Phillips, that the tanks' contents would need to be removed by a licensed waste hauler before the tanks could be removed. Underground storage tank installer Rozycki testified that he had explained to the defendant that disposal of the tanks' contents required either the hiring of a special hauler or the separation out, collection, and hauling away of any hydro-carbons before pumping of water into the village sewer pursuant to nec-essary village approval.

Furthermore, as to the defendant's knowledge that he was pumping gasoline, witnesses Olson, Perez, and Kincaid all testified that they no-ticed the smell of gasoline while the defendant was pumping. Further-more, the defendant asked Olson, without prompting, whether he smelled anything. Given this evidence, the clear fact that the defendant knowingly was pumping from gasoline storage tanks, and the evidence that throughout the pumping the defendant was standing on the site, near the discharge, the trial court clearly could determine that at some time during the pumping process the defendant had knowledge that he was pumping gasoline.

The offense did not require that the defendant have knowledge from the outset of his pumping. We find that the evidence supports the court's conclusion and that the State proved beyond a reasonable doubt that the defendant knowingly violated subsection 12(f) of the Act.

Based on the foregoing, we affirm the judgment of the circuit court of Du Page County.

Affirmed.

UNVERZAGT, P.J., and DUNN, J., concur.