2022 IL App (1st) 210538-U

No. 1-21-0538

Order filed September 26, 2022

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 18674 |
| | ) | |
| DI'JAE BANKS, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COGHLAN delivered the judgment of the court.
Justices Pucinski and Hyman concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction for first degree murder is affirmed where the trial court erred in admitting photographs of her pointing a firearm and smoking purported marijuana, but that error was harmless beyond a reasonable doubt.

¶ 2    Following a jury trial, defendant Di'Jae Banks was found guilty of two counts of first degree murder and three counts of home invasion, and sentenced to a term of 30 years' imprisonment. On appeal, defendant argues the trial court erred in admitting two photographs from defendant's Facebook profile into evidence at trial. One photo depicted defendant pointing a

firearm at the camera and the other showed her smoking a marijuana cigarette. For the following reasons, we conclude the trial court erred in admitting the photographs but, because the evidence of defendant's guilt was overwhelming, the error was harmless beyond a reasonable doubt. For the reasons that follow, we affirm the judgment of the trial court.

¶ 3       Defendant and Tariq Harris were charged with the November 18, 2016[1] felony murder of Javon Wilson and home invasion of Khaliyah Wilson and Javon Wilson.[2]

¶ 4       Prior to trial, the defense filed a motion *in limine* to bar the State from introducing photographs from defendant's Facebook account depicting defendant "with a gun or alleged drugs," alleging the photographs constituted "other crimes evidence [that] cannot be tied to this case." The defense also argued that the photographs were irrelevant because the victims knew defendant, the firearm was not identified as the murder weapon, and the images "may cause the trier of fact to believe that [defendant] is a criminal." In addition, showing an image of defendant with a firearm in connection with an offense involving a firearm would be "highly prejudicial" evidence of "other crimes" and would "inflame the jury."

¶ 5       The State argued that the photos were not "other crimes evidence," but related to "an identification." The shooting occurred at approximately 7:08 p.m. and officers arrived on scene at 7:11 p.m. When the police arrived, Khaliyah showed them defendant's Facebook profile, which included photographs of defendant holding a firearm and posing with Harris. The officers photographed the image on Khaliyah's screen, which included a "timestamp" of 7:36 p.m.

---

[1] Defendant and Tariq Harris were tried simultaneously before separate juries. Harris is not a party to this appeal, but filed a separate appeal that is pending in this court. See *People v. Harris*, No. 1-21-0537.

[2] Because Javon Wilson and Khaliyah Wilson have the same last name, we use their first names.

¶ 6    The trial court denied the motion, reasoning that the photographs were not "so highly prejudicial that they would inflame the jury" or "outweigh the relevance and the probative value they have to how the police did their investigation." The defense filed a motion to reconsider arguing, *inter alia*, that the State could not prove that defendant "posted *** or had any control" over the photographs. The court denied the motion, explaining:

> "[T]his is a course of investigation. The witnesses are testifying to how they identified the defendant. This was screenshots from witnesses, so this is not *** the police just digging up Facebook photos *** trying to *** admit them into evidence."

¶ 7    At trial, Iishia Murphy testified that on November 18, 2016, she lived in an apartment in Chicago with her uncle and her children, Khaliyah, age 16, Javon, age 15, Jeremy, age 14, and Justin Wadley, age 8. That evening, Iishia left to pick up food. On the way home, Khaliyah called and stated that Javon had been shot. She confirmed that she never gave defendant or Harris permission to enter her apartment.

¶ 8    Khaliyah testified that she met defendant through Javon "[s]everal months" before November 2016, and they exchanged "flirtatious messages" on Facebook for about one month. Javon was also friends with Harris.

¶ 9    On November 18, 2016, Khaliyah was at home with her uncle Wardell, her siblings Javon, Jeremy, and Jayden, and her friend Melik Phipps. Khaliyah and Phipps were sitting in the kitchen when Khaliyah heard knocking on the back door. Twice, she asked who was there, but no one responded. Khaliyah opened the door slightly, observed defendant and Harris, and asked them what they wanted. Defendant said that she wanted "her shoes," and asked Khaliyah whether her

mother was home. Khaliyah said that Iishia was not home, closed the door, and went to Jeremy's room to get the shoes.

¶ 10    While Jeremy was speaking to defendant and Harris, they entered the apartment. Khaliyah told them "get out of my mom's house, and she didn't want them there." Khaliyah knew that "if her mom came back and saw people in her house that she didn't want there, we would get in trouble." Phipps offered them the shoes, but an argument began. Defendant said she would "slap [Khaliyah] with this mother***," drew a silver and black firearm from her hoodie and gave it to Harris. Then, defendant punched Khaliya and "busted" her lip.

¶ 11    Everyone entered the living room, where defendant gripped Khaliyah's hair until Javon separated them. Defendant told Harris, "you're just going to let them do this to me." As defendant and Javon "tussl[ed]," Khaliyah heard a gunshot and observed Harris pointing the firearm toward defendant and Javon, and Javon falling. Defendant and Harris "stood there for a minute," and defendant said, "I didn't mean for it to go down like this." Defendant and Harris fled, and Khaliyah called 911.

¶ 12    When police arrived, Khaliyah used her phone to access Facebook and show them defendant's profile, which contained two photographs. In one, defendant was holding a gun and in the other, she was with Harris. At the police station, Khaliyah identified defendant and Harris in photo arrays.

¶ 13    Various photographs, including photos of Khaliyah's lip and arm injuries were introduced into evidence and published to the jury. Khaliyah identified defendant's Facebook profile, which included the two photographs that Khaliyah had shown officers at the scene. One photograph depicted defendant pointing a handgun at the camera and the other photograph showed defendant

with an irregularly shaped cigarette in her mouth and the middle finger of her right hand extended. Khaliyah added that when she showed the police the photograph of defendant holding the gun, she "started crying." A photograph of a cellphone screen displaying defendant's Facebook profile was also admitted. The profile states defendant's name, depicts the photographs described above, and includes the phrases, "Long Live Prince Raheem," "3 Suspects B***," and "2k17 FWM I GOT WHAT U NEED"; the text is interspersed with emoji images of money and smiling faces. The upper righthand corner of the cellphone screen includes the time, 7:36 p.m. Over defendant's objection, these photographs were also published to the jury.

¶ 14    On cross-examination, Khaliyah agreed that her mother "wasn't happy" about her flirtations with defendant and did not want her in their home. Khaliyah stopped talking to defendant a few months before the shooting because defendant had become "obsessive" and tried to fight Khaliyah at school.

¶ 15    Phipps testified that on November 18, 2016, he was in Khaliyah's kitchen and heard a knock at the door. Khaliyah "cracked" the door, and Phipps heard Khaliyah and defendant discuss a pair of shoes. Khaliyah left the kitchen, went to Jeremy's room, and then returned and cracked the door again. Defendant "forced" herself inside the apartment, followed by Harris. Khaliyah told them to leave, but they refused.

¶ 16    While arguing with Khaliyah, defendant placed her hands in her front pocket and said, "I smack this mother f***." Phipps attempted to intervene, and defendant said she would "put a bullet in you." Defendant removed a firearm from her pocket and gave it to Harris. Phipps retrieved the shoes from Jeremy's room, brought them to the kitchen, and told Harris and defendant that they could leave. Harris refused and moved the safety of the firearm "back and forth."

¶ 17   Defendant and Khaliyah entered the living room, where Khaliyah pinned defendant against a wall and defendant grabbed Khaliyah's hair. Javon grabbed defendant and Phipps grabbed Khaliyah. Defendant hit Javon's face and asked Harris, "you just going to let them jump on me?" As Javon grappled with defendant, Harris "aimed the gun at Javon and shot him in the neck." That evening, Phipps went to a police station and identified defendant and Harris in photo arrays.

¶ 18   Jeremy testified that in October, 2016, he traded a pair of pants to defendant in exchange for shoes. On November 18, 2016, at a Starbucks, Jeremy encountered Harris and defendant, who stated that she was "coming to get [her] shoes." Jeremy asked for his pants, but did not schedule a time for the exchange.

¶ 19   Around 7 p.m. that evening, defendant and Harris came to the back door of Jeremy's apartment. Jeremy cracked open the door. Defendant told him to "[g]et the shoes," then shoved the door and entered the apartment with Harris. Jeremy did not invite them inside, and Khaliyah told them to leave. Defendant said, "I will smack you with this gun," then removed a black and silver firearm from her hoodie and gave it to Harris.

¶ 20   Phipps brought the shoes to the kitchen, but defendant began fighting with Khaliyah. As Jeremy and Javon tried to separate them, defendant swung "over" Jeremy, striking Khaliyah's lip. They continued "tussling" in the living room. Defendant struck Javon, who hit her. Defendant asked Harris, "you going to let them do this to me?" Harris chambered a bullet and Jeremy heard a gunshot. Javon collapsed, and defendant and Harris fled. When police arrived, Khaliyah used a phone to access defendant's Facebook page and cried when the page loaded. Jeremy went to the police station and identified defendant and Harris in photo arrays.

¶ 21    Justin testified that around 7 p.m. on November 18, 2016, he was in his bedroom and heard noises from the kitchen. He looked down the hallway, where defendant held a firearm and threatened to slap Khaliyah. Justin observed defendant and Harris fighting with Khaliyah. He also saw defendant pull Khaliyah's hair and punch Javon, who "punched her back." Then, Justin heard a gunshot, saw Javon collapse, and defendant and Harris flee.

¶ 22    Chicago police commander Randall Darlin testified that he responded to the apartment and spoke with Khaliyah, who "identified" defendant as an individual who "came to her rear door and began arguing with her." Khaliyah used a phone to access defendant's Facebook profile, which displayed a photograph of a female holding a firearm. Khaliyah became "very upset about the photograph," cried, and screamed. Jeremy took the phone and accessed another Facebook profile with photographs of an individual whom he identified as the shooter. Darlin took "snapshots" of the Facebook profiles and provided them to detectives.

¶ 23    During a sidebar, trial counsel objected to the State using the Facebook photographs during Darlin's testimony. According to counsel, the photographs were "other crimes evidence" and would be "cumulative" because the State already introduced them during the testimony of the "ID witness." The State responded that it sought to publish the photographs a second time because they represented "statements of identification." The court allowed the State to show Darlin the photographs from defendant's Facebook profile, but did not allow the photos to be published to the jury a second time.

¶ 24    Dr. Lauren Woertz, an assistant Cook County medical examiner, testified that Javon sustained a gunshot wound to the left side of his neck. The wound exhibited stippling, suggesting

that he was shot from one to four feet away. In Woertz's opinion, Javon died from the gunshot wound and the manner of death was homicide.

¶ 25    During the jury instruction conference, the State requested an "identification instruction." The defense objected, arguing that identification "is not an issue." The State agreed to withdraw the instruction unless "an issue comes out in argument."

¶ 26    During closing, the State argued that, following the incident, Khaliyah made "an immediate identification" of defendant and Harris, as follows:

"The Facebook profiles that you saw that Khaliyah testified that she showed to Commander Darlin when he showed up on scene in the presence of Jeremy. It's [defendant]. She shows the second photograph, and she becomes hysterical at that point. She's unable to go any further and then Jeremy takes over.

She goes to the police station after suffering this trauma, after breaking down, seeing the Facebook photos. And after being separated from the rest of her family and being taken to the police, she immediately identifies [defendant] in the photo array and the shooter, *** Harris."

¶ 27    Defendant's counsel argued that the Facebook photographs were "horrible" and an example of "why one shouldn't post things," although "[p]eople post stupid things all the time." Counsel asserted that the State "only introduc[ed]" the photographs to show that Khaliyah and Jeremy "knew who [defendant] was," and the fact that Khaliyah accessed defendant's profile so quickly suggested that she was "still friends with [defendant] on Facebook." According to counsel, that refuted the notion that defendant and Khaliyah were not close when the shooting occurred and suggested that defendant's entry into the apartment did not constitute home invasion.

¶ 28    In rebuttal, the State maintained that the Facebook photographs showed that Darlin captured the images from Khaliyah's phone at 7:36 p.m., "minutes after the shooting," and that Khaliyah and Jeremy "immediately" identified defendant and "cooperated fully" in the investigation.

¶ 29    The jury found defendant guilty of first degree murder and home invasion.

¶ 30    Trial counsel filed an amended motion for new trial arguing, in relevant part, that the trial court erred in admitting the Facebook photographs. The court denied the motion.

¶ 31    Following a sentencing hearing, the court merged the counts into one count for first degree murder and imposed 30 years' imprisonment. Defendant filed a motion to reconsider sentence, which the court denied.

¶ 32    On appeal, defendant contends the trial court erroneously admitted the photographs of her holding a firearm and smoking marijuana as the photographs were not relevant to the charges and prejudiced her. Defendant argues that the photographs lacked relevance to "any contested issue" where Khaliyah, an eyewitness, produced the photographs for police, the other eyewitnesses also knew defendant, and the defense did not contest defendant's identity at trial. Defendant also argues that the State's reference to the photographs during closing argument was unnecessary and the images suggested that she "glorified the image of criminal behavior" and "would be likely to be involved in a murder." According to the State, the photographs were relevant to establishing the police officers' investigatory process and were not prejudicial in view of the "overwhelming evidence of defendant's guilt."

¶ 33    The admissibility of evidence "rests within the discretion of the trial court, and its decision will not be disturbed absent an abuse of that discretion." *People v. Pikes*, 2013 IL 115171, ¶ 12.

"[A]n abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. McDonald*, 2016 IL 118882, ¶ 32. This standard is "highly deferential," and a "clear abuse" of discretion is required to merit reversal. *People v. Peterson*, 2017 IL 120331, ¶ 125. Notwithstanding, "[w]e review the trial court's judgment, not the reasons cited, and we may affirm on any basis supported by the record if the judgment is correct." *People v. Martinez*, 2021 IL App (1st) 182553, ¶ 37. Further, "erroneous decisions on the admission of evidence are subject to harmless error analysis." *People v. Mulosmani*, 2022 IL App (1st) 200635, ¶ 72.

¶ 34    Under Illinois Rule of Evidence 402, "[a]ll relevant evidence is admissible, except as otherwise provided by law." Ill. R. Evid. 402 (eff. Jan. 1, 2011). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011); see also *In re Commitment of Gavin*, 2019 IL App (1st) 180881, ¶ 59. The trial court "may reject offered evidence on grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty, or possibly unfair prejudicial nature." *People v. Harvey*, 211 Ill. 2d 368, 392 (2004).

¶ 35    We find the trial court abused its discretion in admitting the photographs. Although the court instructed the jury regarding the factors relevant for weighing identification testimony, defendant's identity was never contested. Four eyewitnesses—Khaliyah, Jeremy, Phipps, and Justin—identified defendant. The defense theory of the case was that defendant's entry into the apartment did not constitute home invasion. In addition, the firearm in the photograph was never connected to the offense. The testimony that Khaliyah and Jeremy showed Facebook photographs

to the police in order to identify defendant as an offender was sufficient to explain the course of the police investigation. Under these circumstances, the photographs served no explanatory function and were not probative of any contested issue. See *People v. Brakes*, 2021 IL App (1st) 181737, ¶¶ 21, 25, 28 (finding the trial court erred in admitting a photograph of the defendant holding a firearm while standing beside a co-offender who made an alleged gang sign with his hands, where "no trial evidence connected the gun shown to the gun used in the offense" and "[w]itnesses testified that [the defendant and the co-offender] participated in the relevant offenses").

¶ 36    Having determined that the evidence was erroneously admitted, we must consider whether the trial court's error was "harmless beyond a reasonable doubt." *People v. King*, 2020 IL 123926, ¶ 40. In making this determination, we consider "(1) whether the error contributed to the defendant's conviction, (2) whether the other evidence in the case overwhelmingly supported the defendant's conviction, and (3) whether the challenged evidence was duplicative or cumulative." *Id.* A finding of harmlessness under any of the three approaches can suffice. *Brakes*, 2021 IL App (1st) 181737, ¶ 29.

¶ 37    The State's evidence included eyewitness testimony from Khaliyah, Jeremy, and Phipps, who all described defendant and Harris's unauthorized entry into the apartment. All three testified that defendant produced the firearm, threatened Khaliyah with the weapon, gave it to Harris, asked Harris whether he was just going to stand by while they fought, and watched Harris shoot Javon. Justin also testified that he observed defendant holding a firearm and threatening to slap Khaliyah.

¶ 38    The photographs were a relatively minor part of the evidence introduced at trial and were not unduly emphasized during closing arguments. The State only mentioned the photographs while

explaining how the witnesses identified defendant and did not reference the substance of the photographs. Defense counsel also argued, without objection, that the State "only introduc[ed]" the photographs to show that Khaliyah and Jeremy "knew who [defendant] was." In addition, the trial court did not allow the State to republish the photographs during Darlin's testimony and withheld them from jury deliberations.

¶ 39    Considering the record as a whole, the erroneous admission of the photographs was "harmless beyond a reasonable doubt, as the evidence of defendant's guilt was overwhelming." *Mulosmani*, 2022 IL App (1st) 200635, ¶ 75.

¶ 40    Based on the foregoing, the trial court erred in admitting the photographs but that error was harmless beyond a reasonable doubt. The judgment of the circuit court of Cook County is, therefore, affirmed.

¶ 41    Affirmed.