2023 IL App (1st) 210537-U

FIRST DISTRICT,
FIRST DIVISION
May 8, 2023

No. 1-21-0537

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 16 CR 18674 |
| | ) | |
| TARIQ HARRIS, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Lavin concurred in the judgment.
Justice Hyman dissented.

**ORDER**

¶ 1       *Held*: Defendant's convictions for first degree murder and home invasion are affirmed where the trial court did not err in responding to a jury question, admitting identification evidence, or declining to *voir dire* jurors on publicity regarding co-defendant's trial. The court's error in admitting photographs showing defendant posing with a gun was harmless and the sentence imposed was not excessive.

¶ 2       Following a jury trial, defendant Tariq Harris was convicted of first degree murder and home invasion. Defendant was sentenced to a term of 30 years' imprisonment for the murder and a term of 6 years for the home invasion, with the sentences to run consecutively. On appeal, defendant argues that the trial court erred in failing to instruct the jury on the definition of intent, admitting unduly prejudicial photographs into evidence, refusing to *voir dire* jurors about potential

prejudicial publicity, and imposing an excessive sentence. For the following reasons, we affirm.

¶ 3                                                    BACKGROUND

¶ 4        Defendant and Di'Jae Banks were charged with the November 18, 2016[1] murder of Javon

Wilson.[2] They were also charged with home invasion relating to the same incident.

¶ 5                                          Pre-Trial Motion *in Limine*

¶ 6        Prior to trial, defendant filed a motion *in limine* to bar the State from introducing

photographs showing him posing with guns, smoking marijuana, and revealing that his Facebook

moniker was "Rico da Suspect." The State argued that the photographs were relevant to

"identification" and "the course of investigation." Defense counsel claimed that the photographs

were unduly prejudicial and "identification [was] not going to be at issue." The trial court ruled

that the photographs were not "so highly prejudicial that they would inflame the jury" and showed

"how the police did their investigation."

¶ 7                                                    Jury Trial

¶ 8        Iishia Murphy testified that she lived in a Chicago apartment with her uncle and her

children, Khaliyah, age 16, Javon, age 15, Jeremy, age 14, and Justin Wadley, age 8. On November

18, 2016, she received a phone call from Khaliyah that Javon had been shot.

¶ 9        Khaliyah testified that she had known defendant by the nickname "Rico" for several years

and had exchanged "flirtatious messages" with Banks on social media. On November 18, 2016,

Khaliyah was at home with her uncle Wardell, Javon, Jeremy, Wadley, and her friend Melik

Phipps. While sitting in the kitchen with Phipps, Khaliyah heard knocking on the back door. Javon

called out, "[I]s that Tariq Harris?" from his bedroom. Khaliyah opened the door slightly and asked

---

[1] Defendant and Di'Jae Banks were tried simultaneously before separate juries. We affirmed Banks's conviction on appeal. See *People v. Banks*, 2022 IL App (1st) 210538-U.

[2] Because Javon Wilson and Khaliyah Wilson, and Iishia Murphy and Jeremy Murphy have the same last names, we use their first names.

defendant and Banks what they wanted. Banks said that she wanted "her shoes," and asked whether Khaliyah's mother was home. Khaliyah told Banks her mother was not home, closed the door, and went to Jeremy's room to get the shoes.

¶ 10        Khaliyah returned to the kitchen with Jeremy. While Jeremy was talking to defendant and Banks at the back door, they barged into the apartment. Khaliyah told them "to get out of [her] mom's house ***." They began arguing when defendant and Banks refused to leave. Banks threatened to "slap [Khaliyah] with this motherf***er" and drew a silver and black firearm from her hoodie pocket, which she handed to defendant. Banks punched Khaliyah and "busted" her lip. Even after Phipps put the shoes in a bag for them, defendant and Banks did not leave the apartment.

¶ 11        Javon separated Banks and Khaliyah during the fight. After asking defendant if he was "just going to let them do this to me," Banks swung at Javon with a closed fist. While Banks and Javon were "tussling," Khaliyah heard a gunshot and saw defendant holding a gun pointed "towards the direction of [Banks] and Javon." As Javon fell to the ground, defendant and Banks "stood there for a minute." Banks said, "I didn't mean for it to go down like that." Defendant replied, "I didn't know what I was doing," and they ran out of the house.

¶ 12        Khaliyah showed the police Banks's Facebook profile photographs when they arrived at the apartment. In one of the photos, Banks was holding a gun and in the other she was standing with defendant. While looking at the photos, Khaliyah "began to cry" and handed her phone to Jeremy. Khaliyah later went to the police station and identified defendant in a photo array as "the person who shot my brother." Over defendant's objection, the two Facebook photographs were published to the jury.

¶ 13        Phipps testified that Banks and defendant "forced" themselves into the apartment and refused to leave. When Phipps attempted to intervene, Banks said, "I don't know what you stepping in for, I put a bullet in you." Phipps saw Banks remove a black and silver gun from her front pocket

and give it to defendant. He also retrieved the shoes from Jeremy's room, brought them to the kitchen, and told Banks and defendant, "You all got what you all came for, now you all can leave." In response, defendant continued playing with the safety of the gun "back and forth," and said, "[N]o, you all just be cool."

¶ 14     While Phipps was helping Javon "break up the fight" between Banks and Khaliyah, Banks hit Javon in the face, and they began fighting. He also heard Banks ask defendant if he was "just going to let them jump on me?" and saw "defendant [aim] the gun at Javon and [shoot] him in the neck." When Phipps identified defendant in a photo array later that night, he circled defendant's image and wrote the word "Murder"[3] on the photograph.

¶ 15     Jeremy testified that he had known defendant by the nickname "Rico" for three or four years prior to the shooting. In October 2016, Jeremy exchanged a pair of pants with Banks for a pair of shoes. On November 18, 2016, Jeremy ran into defendant and Banks at a Starbucks. Banks said she was "coming to get [her] shoes" and Jeremy asked for his pants back.

¶ 16     Although they had not scheduled a time or date for the exchange, defendant and Banks showed up at Jeremy's back door around 7:00 p.m. that evening. After being awoken by Javon, Jeremy went to the kitchen and cracked open the door. Banks told him to "[g]et the shoes," and Banks and defendant shoved their way into the kitchen. When Khaliyah told them to leave, Banks threatened to "smack [her] with this gun." Banks removed a black and silver firearm from her hoodie pocket and handed it to defendant.

¶ 17     Jeremy testified that Banks fought with Khaliyah and Javon, threatened "to smack" Khaliyah with the gun, and handed the gun to defendant. Defendant slid the chamber back and loaded the gun. Jeremy heard a gunshot and saw defendant pointing the gun at Javon. Later at the police station, Jeremy identified defendant in a photo array as "the one that shot my brother."

_____

[3] The photo array admitted into evidence has the word "Murdered" written on defendant's photo.

¶ 18       Justin Wadley was 8 years old at the time of the shooting. Around 7 p.m. that night, he was in his bedroom and heard noises from the kitchen. He looked down the hallway and saw Banks threatening to slap Khaliyah with a gun. He also saw Banks punching Khaliyah in the face, pulling her hair, and punching Javon, who "punched her back." After hearing a gunshot, Justin saw Javon collapse and defendant and Banks running "out the back door."

¶ 19       Defendant objected to the State showing the Facebook photographs to Officer Darlin for "identification," arguing that the photographs were "other crimes evidence" and "cumulative." The court permitted the State to show Darlin the photographs but did not allow the photos to be published to the jury again.

¶ 20       Defendant testified that he was 16 years old on the date of the shooting and had known Javon since 2013. On November 18, 2016, he and Banks ran into Jeremy at Starbucks and made a plan to exchange Banks's shoes for Jeremy's pants at Jeremy's home later that day. When defendant and Banks arrived at the apartment, Khaliyah answered the door. After talking to Banks, Jeremy opened the door. Khaliyah, Jeremy, and Phipps were standing in the kitchen when he and Banks entered the apartment. Khaliyah and Banks started arguing, and the fight "became physical."

¶ 21       Banks took out a gun and "put it on the deep freezer." Defendant grabbed the gun because he "wanted to get it out of the way." As Khaliyah and Banks continued fighting, Javon and Phipps tried to separate them. Defendant was in the closet, "trying to find a light" because the room was dark as the fight moved into the living room. Banks grabbed Khaliyah and held "her head down so Khaliyah would stop swinging." When Javon grabbed Banks, she pushed him away and he "punched her in the face."

¶ 22       Defendant "felt like [he] had to protect" Banks and "had to get Javon away from her to keep him from hitting her again." Defendant "lifted [his] arm" and "as [he] reached in, the gun

went off." As Javon fell to the ground, defendant "stood there for multiple seconds" in shock. When "the realization of the situation set in," defendant "knew" he and Banks "had to leave." They "went to this girl's house" and "smoked marijuana." Defendant turned himself in to the police the next day.

¶ 23    On cross-examination, defendant testified that he shot and killed Javon "[a]ccidentally," but admitted he did not try to help Javon or remember what he did with the gun after the shooting. He acknowledged that he was "somewhat" familiar with guns, knew where the safety switch was located on the gun, and knew how to chamber a bullet in a semiautomatic gun. He explained the gun he used had a "hair trigger," which can "go off" without pulling the trigger. Defendant acknowledged that he was known as "Rico Da Suspect" and was depicted in the Facebook photograph with Banks holding a "BB gun."

¶ 24    Banks was found guilty of first degree murder and home invasion on July 24, 2019. The next day, defendant's counsel alerted the trial court that "Yesterday *** Banks was found guilty in this courtroom in this case. And word of that guilty made the news, electronic and print." Counsel requested the court "*voir dire* the jurors as to whether or not they heard about yesterday, and not the results." The court denied counsel's request, stating: "I kept giving them the instruction. I'm confident in our jurors that they abide by my instructions. I am going to instruct them again after arguments. So I don't find a need to *voir dire* the jurors."

¶ 25    During deliberations, the jury sent out a note asking: "(1) What is legal definition of intent? Does timing matter, example, before they went to slash through door?" and "(2) Is Tariq legally responsible for Dijae's actions and vice versa for all actions for home invasion?" Defense counsel and the State agreed that the court should instruct the jury that they had received all of the legal instructions that applied to the case and should "continue to deliberate."

¶ 26    Defense counsel later changed his mind and asked the court to instruct the jury on "the

definition of intent" based on the "specific jury request." The State asserted that the instruction was confusing and "would not assist the jury in its deliberations." In denying defense counsel's request, the trial court explained that "[t]heir question was more of a factual question that they have to resolve amongst themselves."

¶ 27    The jury found defendant guilty of first degree murder, home invasion, and of personally discharging a firearm that caused Javon's death.

¶ 28    At defendant's sentencing hearing, Roosevelt Fleming, a court liaison with the Cook County Juvenile Temporary Detention Center, testified that defendant's rule violations during his time in custody included: "malicious destruction of property" after defendant drew gang graffiti in his room on March 2, 2017; fighting with another resident on March 25, 2017; "physical assault towards a peer, unauthorized movement, and fighting" on April 26, 2017; fighting and unauthorized movement on July 13, 2017; and fighting and unauthorized movement on October 20, 2018.

¶ 29    Chicago Police Detective Matthew Nelson testified he arrested defendant for burglary on August 30, 2015. Similarly, Chicago Police Officer Jack Walkosz arrested defendant for burglary on November 17, 2016, noting that defendant had only been released from the juvenile holding facility approximately 17 hours before the instant crime was committed.

¶ 30    Defendant's presentence investigation report revealed that he had not been convicted or adjudicated delinquent of any of the juvenile charges. The victim impact statements of Javon's mother and brother were also admitted in aggravation.

¶ 31    In mitigation, Dr. James Garbarino testified as an expert in adolescent and developmental psychology. Garbarino briefly explained the "evolution of developmental science on adolescent brain functions." In his opinion, defendant's "rendering of the crime itself is full of problems with executive function; not thinking things through, thinking through the consequences of behavior."

Garbarino acknowledged that defendant had "engaged in aggressive *** and self-defeating behavior in detention." Regarding defendant's background, Garbarino noted that Banks was an "older influential youth *** influencing [defendant]'s behavior," and that defendant had been exposed to "violence and threat and trauma." Based on his "average intellectual ability" and the "unconditional love" of his mother, Garbarino believed that defendant could be rehabilitated. Garbarino's written report, records of defendant's grades from his first two years of high school, and a mitigation expert report were admitted at the hearing.

¶ 32 The State argued that "this cold-blooded home invasion and murder is sufficient aggravation that supports a finding of incorrigibility" and warrants a "substantial sentence." The defense requested a minimum sentence based on defendant's age, personal characteristics, and rehabilitation potential. In allocution, defendant apologized for his actions but maintained that the shooting "was an accident."

¶ 33 Although the court did not "recite each factor" considered in aggravation and mitigation, it emphasized that defendant's conduct caused serious harm, there was evidence that he had engaged in "prior criminal activity," and the sentence was necessary to deter others. The court considered defendant's age and level of maturity at the time of the offense, "including the ability to consider risk and consequences of behavior," his home and neighborhood environments, and childhood trauma. The court found "that the minimum or the lower range of the minimum [was not] appropriate," but defendant was not "irreparably corrupted beyond the possibility of rehabilitation" and had "rehabilitative potential." Accordingly, the court declined to impose a sentence of "over 40 years" or an enhanced sentence. The court ultimately sentenced defendant to consecutive terms of 30 years' imprisonment for first degree murder and 6 years for home invasion.

¶ 34 ANALYSIS

¶ 35 Jury Question

¶ 36    Defendant argues that failing to instruct the jury on the definition of "Intent," as provided in IPI Criminal No. 5.01A, deprived him of a fair trial since "intent was the main contested issue." The State maintains that this instruction was not responsive to the jury's question because "there were several different mental states at issue."

¶ 37    Jurors are entitled to have their inquiries answered. *People v. Childs*, 159 Ill. 2d 217, 228-29 (1994). "Generally, the trial court must instruct the jury if the jury has posed a question or requested clarification on a point of law arising from facts about which there is doubt or confusion." *People v. Manning*, 334 Ill. App. 3d 882, 890 (2002). The court may properly decline to answer a jury's question when "the instructions are readily understandable and sufficiently explain the law, where further instructions would serve no useful purpose or could mislead the jury, when the jury's inquiry involves a question of fact, or if the answer could cause the court to express an opinion that might direct a verdict one way or another." *Id*. We review the trial court's response to the jury for an abuse of discretion. *People v. Reid*, 136 Ill. 2d 27, 38 (1990).

¶ 38    IPI Criminal No. 5.01A defines intent as follows: "A person [(intends) (acts [(intentionally) (with intent)]] to accomplish a result or engage in conduct when his conscious objective or purpose is to accomplish that result or engage in that conduct." Where the words of a "jury instruction have a commonly understood meaning, the court need not define them with the use of additional instructions." *Manning*, 334 Ill. App. 3d at 890. This is particularly true where, as here, "the pattern jury instructions do not provide that an additional instruction is necessary." *Id*.

¶ 39    The jury in this case asked for the definition of intent *in the context* of "timing." Since IPI Criminal No. 5.01A does not address the aspect of timing, it was not unreasonable for the trial court to conclude the instruction "could mislead the jury." *Manning*, 334 Ill. App. 3d at 890. *Contra People v. Griffin*, 351 Ill. App. 3d 838, 854-55 (2004) (after the jury requested clarification on the difference between knowledge and intent, the trial court erred by failing to give a portion

of a jury instruction that would correctly answer the jury's question). Accordingly, the trial court did not abuse its discretion in failing to provide an instruction on the definition of intent.

¶ 40                                    Admission of Facebook Photographs

¶ 41        The admissibility of evidence "rests within the discretion of the trial court, and its decision will not be disturbed absent an abuse of that discretion." *People v. Pikes*, 2013 IL 115171, ¶ 12. "[A]n abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. McDonald*, 2016 IL 118882, ¶ 32. This standard is "highly deferential," and a "clear abuse" of discretion is required to warrant reversal. *People v. Peterson*, 2017 IL 120331, ¶ 125. "We review the trial court's judgment, not the reasons cited, and we may affirm on any basis supported by the record if the judgment is correct." *People v. Martinez*, 2021 IL App (1st) 182553, ¶ 37. "[E]rroneous decisions on the admission of evidence are subject to harmless error analysis." *People v. Mulosmani*, 2022 IL App (1st) 200635, ¶ 72.

¶ 42        Defendant's identity was not a contested issue in this case. Four eyewitnesses—Khaliyah, Jeremy, Phipps, and Wadley—identified defendant at trial. Defendant admitted that he was in the house holding gun when Javon was shot. The firearms in the photographs were not connected to the charged offenses and the course of the investigation was sufficiently explained by testimony that the witnesses relied on Facebook photographs to identify the defendant. See *People v. Brakes*, 2021 IL App (1st) 181737, ¶¶ 21, 25, 28 (finding the trial court erred in admitting a photograph of the defendant holding a gun while standing beside a co-offender who made an alleged gang sign with his hands where "no trial evidence connected the gun shown to the gun used in the offense" and "[w]itnesses testified that [the defendant and the co-offender] participated in the relevant offenses"). For these reasons, the trial court erred in admitting Facebook photographs showing defendant and Banks posing with money, guns, and marijuana.

¶ 43        In determining whether this error was "harmless beyond a reasonable doubt," we consider: "(1) whether the error contributed to the defendant's conviction, (2) whether other evidence in the case overwhelmingly supported the defendant's conviction, and (3) whether the challenged evidence was duplicative or cumulative." *People v. King*, 2020 IL 123926, ¶ 40. A finding of harmlessness under any of the three approaches suffices. *Brakes*, 2021 IL App (1st) 181727, ¶ 29.

¶ 44        The eyewitness testimony of Khaliyah, Jeremy, and Phipps established that defendant and Banks forced their way into the apartment, that a fight ensued between Khaliyah and Banks, that Banks threatened to slap Khaliyah with a gun, and that she removed a gun from her pocket and handed it to defendant. Phipps saw defendant shoot Javon. Khaliyah and Jeremy heard a gunshot and saw defendant pointing a gun toward Javon as he fell to the ground. Finally, defendant admitted he shot Javon, albeit "accidentally."

¶ 45        Regarding the State's closing argument that the photographs showed that defendant "knew how to use a gun," defendant's own testimony established that he was "somewhat" familiar with guns. Given the overwhelming amount of evidence introduced against the defendant at trial, the erroneous admission of the photographs was "harmless beyond a reasonable doubt." *Mulosmani*, 2022 IL App (1st) 200635, ¶ 75.

¶ 46                                     Photo Array

¶ 47        When viewing the photo array, Phipps circled defendant's image and wrote the word "Murdered" on the photo. Defendant argues that this "unduly suggestive" and "highly prejudicial" evidence was "not probative of any disputed trial fact." The State asserts that the photograph explained the police investigatory procedure.

¶ 48        Although this claim was not preserved for appeal, defendant seeks review under the plain error doctrine or as an ineffective assistance of counsel claim. Pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984), defendant must show that his counsel's representation "fell

below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. Counsel is not ineffective for failing to preserve meritless issues. *People v. Coleman*, 158 Ill. 2d 319, 349 (1994).

¶ 49    The plain error doctrine permits a reviewing court to consider an unpreserved error when a clear or obvious error occurred and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatowski*, 225 Ill. 2d 551, 565 (2007). Under either prong, the burden of persuasion rests with the defendant. *People v. Sargent*, 239 Ill. 2d 166, 190 (2010). The admissibility of evidence "rests within the discretion of the trial court, and its decision will not be disturbed absent an abuse of that discretion." *People v. Pikes*, 2013 IL 115171, ¶ 12.

¶ 50    In arguing that "the State cannot use the identification exception to introduce otherwise inadmissible evidence that happened to accompany the photo array," defendant relies on *People v. Anderson*, 2018 IL App (1st) 150931. In *Anderson*, a witness testified that he saw the defendant carrying a gun in his waistband. *Id.* ¶ 8. Three days later, the witness went to the police station and identified the defendant in a photo array. *Id.* ¶ 9. Next to the defendant's picture, the witness wrote: "This is the person I know as Lord. He told me his name was Lord. I saw a gun in his waistband. The other guy took the gun from Lord and shot at the Monte Carlo." *Id.* The State published the photo array with the witness's notes on a video screen for the jury to view and asked the witness to "reconfirm[] his handwritten statements" about the defendant. *Id.* The State also displayed the photo array and notes during closing argument. *Id.* ¶ 48.

¶ 51    On review, we found that the initial identification testimony was admissible, but asking the witness to confirm the handwritten statements while displaying the writing on a screen "unfairly and improperly emphasized [the] written out-of-court statements in the eyes of the jury." *Id.* ¶¶ 42, 47-48. We noted that "under the prior identification exception, the witness's description of the offense is limited to that which is necessary 'to make the identification understandable to the jury.' " *Id*. ¶ 48 (quoting *Brown v. United States*, 840 A.2d 82, 89 (D.C. 2004)). The State clearly exceeded this standard in *Anderson* by displaying handwritten statements that did not "enhance the jury's understanding of the identification." *Id.* In contrast, the writing challenged here was limited to a single word and did not describe the shooting or Phipps's familiarity with defendant.

¶ 52    We find that the trial court did not err in admitting the picture of the photo array. Therefore, defendant is not entitled to review of this claim under principles of plain error.

¶ 53                    Refusal to *Voir Dire*

¶ 54    Defendant argues that the trial court erred in denying his motion to *voir dire* the jurors about their knowledge of "extensive media coverage" concerning the verdict in Banks's jury trial.

¶ 55    "Not every newspaper article published requires the court to poll a jury." *People v. Romero*, 189 Ill. App. 3d 749, 759-60 (1989). "Whether a jury should be questioned about an allegedly prejudicial newspaper article rests in the sound discretion of the trial court." *People v. Barrow*, 133 Ill. 2d 226, 263 (1989). In exercising this discretion, "the court must first review the publicity to determine whether it can be perceived as prejudicial." *People v. Moore*, 199 Ill. App. 3d 747, 770 (1990). "It is the improper exercise of that discretion that is error, not the refusal to interrogate the jury." *Romero*, 189 Ill. App. 3d at 760.

¶ 56    When a defendant claims prejudice from the media, "it is the defendant's burden to present the allegedly prejudicial material to the court." *People v. Hipkins*, 97 Ill. App. 3d 174, 178 (1981). Unlike the specific newspaper article at issue in *People v. Cox*, 74 Ill. App. 2d 342, 344 (1966),

defense counsel in this case failed "to present the allegedly prejudicial material to the court." *Hipkins*, 97 Ill. App. 3d at 178. Instead, he relied on general "news, electronic and print."

¶ 57    In addition, the trial court repeatedly admonished the jury not to consider "the internet or any other sources to search for information about this case or the law that applies to the case" throughout the trial. See *People v. Sangster*, 2014 IL App (1st) 113457, ¶ 78 ("The jury is presumed to follow the instructions that the court gives it."). Under these circumstances, the trial court did not abuse its discretion in declining to *voir dire* the jurors.

¶ 58                                  Sentencing

¶ 59    Defendant argues that the trial court failed to consider all evidence in mitigation pursuant to 730 ILCS 5/5-4.5-105 and imposed an excessive sentence. The State asserts that defendant forfeited this claim by failing to raise it in a postsentencing motion.

¶ 60    To preserve a claim of sentencing error, a defendant must make a contemporaneous objection and raise the issue in a postsentencing motion. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). Defendant's motion to reconsider sentence alleged his sentence was "excessive in view of the defendant's background and the residual doubt regarding these offenses." In addition, at a hearing on the motion defense counsel argued that defendant's sentence "is inappropriate for the nature of this offense considering his age, the circumstances, the actions, [and] the activities around there." Accordingly, this claim was not forfeited.

¶ 61    A trial court's sentencing decision is entitled to great deference and should not disturbed absent an abuse of discretion. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). The trial court, rather than the reviewing court, is in a much better position to weigh the relevant sentencing factors. *People v. Snyder*, 2011 IL 111382, ¶ 36. A reviewing court must not substitute its judgment for that of the sentencing court just because it would have weighed the applicable sentencing factors differently. *People v. Alexander*, 239 Ill. 2d 205, 213 (2010). "A sentence which falls within the

statutory range is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense." *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007). Absent some affirmative indication to the contrary, we presume the trial court considered all mitigating evidence before it. *People v. Jones*, 2014 IL App (1st) 120927, ¶ 55.

¶ 62    Here, defendant was convicted of first degree murder and home invasion. The sentencing range for first degree murder is 20 to 60 years' imprisonment. 730 ILCS 5/5-4.5-20(a). For home invasion, the range is six to 30 years. 720 ILCS 5/19-6(a)(2); 730 ILCS 5/5-4.5-25(a). The 36-year sentence imposed by the trial court in this case fell within the lower end of the applicable statutory range. A sentence that falls within the applicable sentencing range is presumed to be proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 63    Defendant relies on *People v. McKinley*, 2020 IL App (1st) 191907, in asserting that the trial judge did not "apply the factors *** accurately or *** [understand] the objective of the statute." In *McKinley*, we found "that the trial court abused its discretion by disregarding evidence of defendant's extensive rehabilitation and improperly considering certain sentencing factors during the resentencing hearing." *Id.* ¶ 91. Specifically, the trial court "gave improper weight to the need to deter future criminal conduct," considered peer pressure as an aggravating factor, and "improperly considered defendant's age as it applied to his offense." *Id.* ¶¶ 87-90.

¶ 64    Unlike in *McKinley*, the trial judge in this case considered defendant's age, youth, impetuosity, level of maturity, family history, cognitive or developmental disability, participation in his defense, and juvenile/criminal history at the sentencing hearing. The court ultimately found that defendant had "rehabilitative potential" and was not "irreparably corrupted beyond the possibility of rehabilitation," and imposed a sentence significantly lower than the statutory maximum. We will not substitute our judgment for that of the trial court in relation to the weight

afforded each of these factors. The record does not support defendant's claim that the court failed to consider or misunderstood the statutory sentencing factors.

¶ 65                                    CONCLUSION

¶ 66         For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 67         Affirmed.

¶ 68         JUSTICE HYMAN, dissenting:

¶ 69         This appeal arises from the shooting death of a youth, by another youth, in front of other young people. Their accounts conflicted and overlapped, as one might expect. Sifting through the evidence, the jury had to decide who thought what and when. Did Dijae Banks and Tariq Harris commit a home invasion? Did Harris murder his friend Javon Wilson? Or did Harris mishandle a firearm and recklessly kill Wilson?

¶ 70         The majority finds the trial court erred by admitting Facebook photographs and affirms, even though this error affected the outcome. I would reverse and remand.

¶ 71                        Admission of Facebook Photographs

¶ 72         The majority recognizes, and I agree, that the Facebook photographs were (i) not evidence of the alleged crimes, (ii) unnecessary to explain the investigation that followed, and (iii) irrelevant to any issue before the jury. *Supra* ¶ 42. But I part with the majority on the role the photographs played in the jury's verdict. The record demonstrates that the State failed to satisfy its burden to prove the admission of the photographs was harmless beyond a reasonable doubt. *People v. Walker*, 211 Ill. 2d 317, 341-43 (2004) (reversing, noting length of deliberations, content of jury's questions, and relation of improper evidence to parties' theories).

¶ 73         The State used these photographs for a purpose—to make plausible its theory and undercut the defense that Wilson's death was "a horrible, tragic, unfortunate accident." The defense contended that a clothing swap morphed into a fight which morphed into a shooting. A shot was

fired as Banks and Wilson grappled with one another and as Harris joined the fray while mishandling a loaded gun.

¶ 74    In contrast, the State opened its case by describing Banks and Harris as partners in crime: "They came in together, they killed together, and they fled together." In closing, the State tied this theory to the photographs: "Once the police arrive[], there's immediate identification. Khaliyah [Wilson] shows the police her cell phone and shows the profile picture of [Banks]. She shows the photo that makes her hysterical, which is the photo of [a] partner in crime."

¶ 75    The majority finds overwhelming evidence of guilt. But some of the State's witnesses corroborated what Harris recounted on the stand. For example, Khaliyah did not describe Banks and Harris as barging their way into the home. Instead, she saw them speak with her brother, Jeremy Murphy, and then push an open door. She could not overhear them, but Jeremy was the person they had come to see, having spoken after school about retrieving Banks' shoes.

¶ 76    All recalled Khaliyah and Banks arguing and fighting soon after. All recalled Harris held the gun only after Banks drew the gun from her hoodie and relinquished it. From there, the oldest (a 19-year-old) recounted Harris acting recklessly. Melik Phipps testified that, as Khaliyah and Banks tussled, Harris stood by and "play[ed] with the safety back and forth." All recalled Banks and Harris fleeing soon after the gun went off. No one disputed that, a day after shooting his friend, Harris turned himself over to the police, escorted by Banks' mother.

¶ 77    The physical evidence of the shooting—gunpowder stippling on Wilson, one spent cartridge—matched Harris' account of lurching toward Banks and Wilson while holding a loaded firearm with a "hair trigger." Likewise, Khaliyah's testimony about Harris' post-shooting statement supported Harris' account. Harris said he "didn't know what he was doing."

¶ 78    Given this evidence and the parties' theories, the jury rightly focused on intent: who thought what and when. While asking for a definition of intent, the jury inquired: "Does timing

matter, for example, before they went to[/]through door?" The jury also asked: "Is [Harris] legally responsible for [Banks'] actions and vice versa for all actions for home invasion[?]" The evidence conflicted, overlapped, and supported a verdict that Harris mishandled a loaded gun after a clothing swap had morphed into a fight.

¶ 79        Yet, the jury deliberated after the State knocked them off course repeatedly. The State flagged these improper photographs when opening its case. And, while questioning the first witness, the State published them. Khaliyah recounted how she "began to cry" when showing them to the police. (A first responder testified to her reaction as well.) The State also called Murphy to recount Khaliyah's devastation when seeing Banks' photographs of Harris glorifying gun use. The photographs from Banks' and Harris' Facebook accounts depict Harris (named "Rico da Suspect") holding apparent firearms, including one in which he aims at the camera.

¶ 80        All of this—the State's reliance on the Facebook photographs, the parties' conflicting theories, and the jury's questions indicating it struggled with the evidence—necessitates reversal. *See Walker*, 211 Ill. 2d at 341-43. I would find that the State has not carried its burden to show this error was harmless beyond a reasonable doubt.